AO 91 (Rev. 5/85) Criminal Complaint    AUSA TERRENCE J. THOMPSON   ATF S/A Steve McKean

# United States District Court

**SOUTHERN** DISTRICT OF **FLORIDA**

UNITED STATES OF AMERICA

V.

FINLANDIA PINEDA

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

97-4149-BSS

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about 08/25/97 through 9/10/97 in **Broward**, in the **Southern** District of **Florida** defendant did, (Track Statutory Language of Offense) knowingly and intentionally use interstate commerce facilities in the commission of a murder for hire; and in possession and transfer of a machine gun; and possession and transfer of a silencer;

in violation of Title **18** United States Code, Section(s) **1958, 922(O) and Title 26, U.S.C. 5861(d) and (e)**

I further state that I am a **ATF Special Agent** and that this complaint is based on the following facts:

Official Title

Please see attached affidavit.

Continued on the attached and made a part hereof:  [x] Yes  [ ] No

Signature of Complainant
STEVE MCKEAN, SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

Sworn to before me, and subscribed in my presence,

September 10, 1997                at  Fort Lauderdale, Florida
Date                                   City and State

BARRY S. SELTZER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## **AFFIDAVIT**

I, Steve McKean, being duly sworn, deposes and says:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco and Firearms (ATF), and have been so employed for approximately nine years. Currently I have been assigned to the Broward County High Intensity Drug Trafficking Area (HIDTA) Task Force consisting of various state and local agencies. I have learned the following information in my official capacity by first hand observations, by receiving information from other law enforcement officers involved in this investigation or by receiving information from confidential sources.

2. On or about August 25, 1997, Broward County Sheriff's Office Detective Jay Barnhouse received information from a confidential source that he/she had been approached by a female, later identified as **FINLANDIA PINEDA**, who wanted her husband *[later identified as James Serbrieu,]* murdered. The source alleged that **PINEDA** said she had firearms available to commit the murder.

3. On August 26, 1997, the source called Detective Barnhouse and introduced him to **PINEDA**. During a taped phone conversation Detective Barnhouse agreed to meet with **PINEDA** on August 27, 1997. **PINEDA** stated she would bring firearms with her and added that she had access to more firearms which were up north. **PINEDA** asked Detective Barnhouse how soon the murder could be committed and Detective Barnhouse stated she would have to talk to his associate.

4. On August 27, 1997, Detective Barnhouse and I, acting in an undercover capacity, met with **PINEDA** at the Days Inn Motel, 1411 NW 31st Avenue, Pompano Beach, Broward County, in the Southern Judicial District of Florida. During a videotaped meeting, **PINEDA** handed me a piece of paper which contained the name James Seyfried, three phone numbers where Seyfried could be reached and a home address of 104-80 42nd Ave., Apt. 3B, Jackson Heights, Queens, New York.

5. **PINEDA** said Seyfried was a limousine driver and asked me to make the murder look like a robbery since robberies happen often in the limousine business. **PINEDA** stated that she wanted the murder done fast and easy sans suffering because she does not hate Seyfried.

6. During this meeting, **PINEDA** provided Detective Barnhouse and I with three bags which contained three suspected silencers, a Colt .22 caliber pistol, serial number 105156, with a suspected black silencer, a Fabrique Nationale D'Armes De Guerre .22LR pistol, serial number 35720P3, with magazine, a Sten MKII machinegun, serial number FU35813, approximately 700 rounds of various caliber ammunition and miscellaneous firearms items. **PINEDA** stated that the aforementioned items belonged to Seyfried and added that he has better firearms in New York.

2

7. **PINEDA** later stated that she knew exactly where three other machineguns were located in New York and that she would turn them over to me upon Seyfried's death.

8. I showed **PINEDA** a silver silencer and she confirmed that it was a silencer that attached to an Uzi which is currently in New York. **PINEDA** stated that she could get prison time for having machineguns and said that if she was caught with a silencer she would be in trouble.

9. **PINEDA** also provided me with a photograph of Seyfried which she stated was current. **PINEDA** agreed to pay $2,500 as a down payment for the murder and an additional $5,000 after Seyfried's death. **PINEDA** also agreed to turn over the three other machineguns that Seyfried had in New York.

10. **PINEDA** provided me with an 800 pager number so that she could be reached at any time. **PINEDA** asked me to page her prior to committing the murder so she could go to church for the purposes of an alibi.

11. **PINEDA** stated that she wanted the murder done as soon as possible and stated she would deliver the $2,500 down payment the following day. **PINEDA** stated that the money would not come from her checking account, so no transactions could be traced to her. The meeting was subsequently terminated.

3

12. On September 2, 1997, **PINEDA** paged Detective Barnhouse and during a recorded conversation stated that she was under the impression that he and I were in New York and that the murder would be imminent. Detective Barnhouse advised **PINEDA** that she would have to pay the $2,500 down payment before the murder would take place. **PINEDA** asked Detective Barnhouse if she could pay he and I after the murder, and Detective Barnhouse stated that was unacceptable. **PINEDA** stated she would forward the money through her cousin. The call was then concluded.

13. On September 4, 1997, **PINEDA** paged Detective Barnhouse from New York. During a recorded conversation, **PINEDA** stated she would have her cousin deliver the $2,500 down payment to Detective Barnhouse. **PINEDA** reiterated her request that her husband be murdered and provided Detective Barnhouse with suggestions for me on how the murder could be accomplished.

14. **PINEDA** advised that she knows where two Uzi machineguns are located that belong to Seyfried, adding that she could not obtain them until Seyfried was dead. **PINEDA** also provided Detective Barnhouse with Seyfried's work schedule and the call was then terminated.

4

15.     On September 8, 1997, **PINEDA** again paged Detective Barnhouse from New York. **PINEDA** again stated her willingness to have Seyfried murdered adding that she showed how serious she was by providing the firearms and silencers to Detective Barnhouse and me on August 27, 1997.  **PINEDA** stated that if I could not bring the firearms and silencers to New York, she had a Glock available in New York that I could use for the murder. **PINEDA** added that the Glock did not have a silencer.

16.     **PINEDA** stated that her cousin Johnny LNU would visit South Florida the following day in order to pay Detective Barnhouse the $2,500 down payment for the murder. **PINEDA** again gave suggestions on how the murder could be accomplished and asked that it be completed by Saturday September 13, 1997.

17.     On September 9, 1997, Detective Barnhouse was paged by Johnny LNU.  Arrangements were made to meet at the Regal Movie Theater located at 6415 N. Andrews Avenue, Ft. Lauderdale, Florida. Detective Barnhouse and I visited the theater and met with Johnny LNU who claimed he was **PINEDA'S** cousin.  LNU confirmed he was acting on **PINEDA'S** behalf and gave Detective Barnhouse an envelope which contained $2,500 in U.S. currency.

18.     The meeting was concluded and LNU was followed to the area of Interstate 95 and Cypress Creek Road, Ft. Lauderdale, Florida, where he was observed entering a grey Plymouth Voyager van

5

bearing Florida license plate WMH 34G. This van is registered to Marvin D. Buckman, 161 Belleaire Drive, Palm Coast, Florida, **PINEDA'S** home address.

19. On September 9, 1997, I received an ATF National Firearms Registration Records Search in regards to **PINEDA**, Seyfried and the Sten MKII machinegun, serial number FU35813. The machinegun was not registered nor did **PINEDA** or Seyfried register any firearms.

**FURTHER AFFIANT SAYETH NAUGHT**

_____
STEVE McKEAN
Special Agent, Bureau of ATF

Sworn to and subscribed
before me this 10th
day of September, 1997.

_____
BARRY S. SELTZER
U.S. MAGISTRATE JUDGE

6